Thank you, your honors. Good morning. My name is Karen Lindholt. I am here on behalf of the appellants, the Lands Council, and Wild West Institute. I would ask to reserve five of my 20 minutes, please. Appellants are here because they have challenged the Forest Service decision to log almost 4,000 acres of national forest lands in the northernmost county in northern Idaho. The logging will take place in an area that provides habitat for numerous sensitive and management indicator species, such as the blackback woodpecker, flammulated owl, northern goshawk, fisher, western toad, and pileated woodpecker. The Forest Service has chosen these species due to viability concerns. The Forest Service must manage the habitat of these species to prevent further declines in a species. Counsel, I wonder if I could just interrupt for a second. As you know, this is the second time around for this case. You're before Judge Gould and others in the Powell case. Judge Gould, in his written opinion, outlined a number of criteria that the Forest Service and others had to meet in order to satisfy the laws under consideration. Now, they have purported to respond to that opinion. Lands Council has indicated a number of problems as you see it. Seemingly material issues of fact on which there is clearly no agreement. Why shouldn't we be sending this case, assuming we take care of the interim in terms of logging and so on and so on, why shouldn't this case be going back to the district court for a trial to ferret out whether in fact you are right or whether the Forest Service is right? Because there's no reconciling your positions. I mean, you are adamantly opposed. They want to go forward. They say they've complied. And the record is difficult, frankly, on both sides. What's your response to that? Judge Smith, I just want to make sure, though, we have a clear understanding. Lands Council versus Powell and Judge Gould was a separate logging project. I understand that. Okay. I just wanted to make sure. However, the underlying facts were similar. As, of course, this Court has found in the past, there is a pattern of the Forest Service engaging in projects and not having the proper scientific foundation supporting. So on that issue specifically, with respect to the violation of the National Forest Management Act, which requires that there be sound scientific methodology underlying what the Forest Service is doing, one of the ones that we have is that the Forest Service is not engaging in projects. And so there is a pattern of the Forest Service engaging in projects. Absolutely, they were unsuccessful. And I share Judge Smith's view that it's difficult. Maybe with another year's study we could understand it all. But, I mean, it's difficult to determine from the written record who is correct without some more exploration of the issues with witnesses who could answer some questions. Well, I guess, Your Honor, in response, this is a record review case. And, of course, under NEPA, the public is entitled to know how the public lands are being managed. So when the public receives a final supplemental environmental impact statement, a record of decision, and they're told 4,000 acres will be logged, including critical wildlife habitat, that's based upon the record. The agency had the record in front of it. The record review is based upon what is in the record and not what additional witnesses might testify to. What is in the record? And this is where, of course, the devils are in the details. And, admittedly, this is very complex. And I don't envy you sitting here trying to understand this in very short order. But the fact is that one of the purposes of NNEED is to go in and log within 277 acres of old growth for the purpose of restoring wildlife habitat. But yet one needs to just look at any of the studies cited, whether it be on the goshawk or the flammulated owl and the fisher. First of all, the study on the fisher was from 1982, not site-specific. Judge Fletcher's opinion in Ecology Center v. Austin talks about the need for the Forest Service relies upon call for site-specific studies. If you're messing around in this critical old growth habitat, you need to be sure that you are not going to cause irreversible harm. They haven't done that. The only study in the record is the Dawson Ridge on the flammulated owl from 2006 in the Mission Brush General Area. Mind you, it took place on 18 acres, five one-fifth acre plots. And the most important part is what that study concludes. And that study reads, and this may be found in the excerpts of record, page 77, the objectives of recent silvicultural prescriptions on dry forest types developed on Bonner's Ferry Ranger District have been uneven age systems designed to restore historic structure. In many cases the study was not found in the record. I believe it was October 2006, Your Honor. 2006? Yes. Why didn't you go to trial? Well, what happened is my clients filed the complaint and the motion for TRO preliminary injunction. Just so you understand, Judge Lodge has a policy where he does not. Between a motion for preliminary injunction. Right. And my question to you is this. Why didn't you go to trial? We were not given the option to go to trial, nor were we given an option to have a hearing on the P.I. We have summary judgment scheduled. Our opening brief on summary judgment is scheduled May 25th. We will have the hearing sometime in August on summary judgment. But, of course, the project could be entirely logged by then. Well, unless there's a preliminary, which is what you're asking for. Yes. Now, as I understand it, there was no urgency about a preliminary because the report was that there would be no logging during the winter months. No. Actually, the way it worked was the motion for the TRO preliminary injunction was filed in October. At that point, the Forest Service said the TRO is not necessary because the logging won't commence until December 2006. We agreed upon a briefing schedule, and at that point, when the briefing was finished, the representative of the logging company said we are going to begin logging, and my clients renewed their motion for the temporary restraining order on December 1. Judge, the lower court did not deny that motion for a TRO until December 18th. The next day, or shortly thereafter, the logging commenced, which, of course, is right into the Christmas holiday. And therefore, as you often, I'm sure, find yourself in, the situation where there's urgency because old growth is on the cutting block, critical habitat is on the cutting block, and we don't have time to brief this situation. So that's where we are. Logging is going on now? Logging has been going on, except for in those 277 acres that this court said that we are not going to entertain a say of the injunction pending. We're not going to entertain the injunction pending appeal because the defendant has represented to the court that they won't go into those 277 acres of old growth. So, yes, logging is still going on in parts of the project, just not in those 277 acres. Are they the more critical acres, the 277? Is there some reason that? No. In fact, in my client's position, thank you for asking that. No, it's all critical. My clients would like it all to be enjoined. Apparently, the motions panel, which was Judge, I believe, Silverman and Paez, apparently based upon the small statement they made, found the 277 acres of old growth to be critical as they are, but the fact is it's up to 4,000 acres, much of it in habitat of the management indicator species. So we are asking that all of it be enjoined. If you get back to a little bit about what we talked a few minutes ago, I appreciate the fact that you're here seeking a preliminary injunction. But the reality is, I mean, as the Lands Council has indicated and, frankly, the Forest Service and the company have responded, everybody understands that these are pristine, beautiful areas, protected habitats. This is very, very important. But unfortunately, much of our jurisprudence is based upon, you know, affidavits and swearing contests, not trials. And you get the, you know, he said, she said kind of a thing, and it is very unsatisfactory in terms of really getting to the bottom of what the truth is. In my heart of hearts, I can't believe that the Lands Council has ever seen a logging program it likes. I can't believe that there isn't something that the Forest Service sees that they don't think they can probably do. So you've got the irresistible force meeting the immovable object. We're charged to carry out our oath under the Constitution. We all recognize the importance of these very important environmental issues. But, frankly, we are, there's a cascade of contradictory facts. The trial court has done its best to determine the likelihood of success or non-success, and in this case has determined that there is a probability of success in each of the areas that you have raised. The trial court seems to have concluded that even though the Powell decision is not exactly in this area, that the Forest Service and others have responded to what the court said. I would renew my question to you. Assuming that arrangements could be made, and we'll talk to the opposing counsel when they're here, assuming arrangements could be made for some type of an agreement, a standstill agreement, or failing that, some type of injunctive relief to be able to go back and really get this ferreted out in a trial, a prompt trial, do you have any objections to that? No. No, Your Honor. How long would it take? How long would it take to conduct a trial? Yes. Two to three days. How long would it take to get to trial? Right. Next week. Oh. Is no discovery required? Well, again, this is all based upon the administrative record. Yes. I have three compact discs, which is the entire administrative record. The Forest Service cannot at this point call witnesses to testify and talk about things that weren't in the administrative record. So they couldn't explain what the, you know, for instance, the study that they conducted, which you find to be inadequate. They couldn't bring in an expert to say here is why this study is adequate? No, because that defeats the whole point of NEPA, which is to disclose to the public, give full disclosure to the public what is going to happen to the national forests, and give the public a chance to respond, which my clients did. There's the whole administrative process, the commenting, the appealing. And only then, once you have exhausted your administrative rights, do you then have an opportunity to bring litigation. If new witnesses came in, then how would my clients respond? Because my clients have taken months to follow this. But, I mean, my clients would be glad to have a trial. I guess in response to Judge Smith, I just want to say, philosophical differences aside, I think we all agree they are there. The fact is my clients are here, and I as a lawyer am here, because there is a violation of the National Forest Management Act and the National Environmental Policy Act. And those obligations of the agency are set forth very, very clearly in Ecology Center v. Austin, as well as in the Lands Council v. Powell. And the violations are similar. Again, I started to talk about the studies here. They're very similar to the outcome is the same as in the Ecology Center v. Austin. The judges there looked at that and said, here the Forest Service says it's going to go in and conduct some salvage logging and old growth. It's going to improve habitat. It's going to do certain things. But the court looked below that, that bare allegation, and said, but you know what? There's nothing in the record supporting it. In fact, the studies, scientists, leading scientists, if they were called today, would say there's a lot of dispute. There's a lot of dispute as to exactly what the impact of this will be. And the fact that That is, in fact, the very reason why I and my colleagues are raising the issue of the trial, because there you can, without augmenting the administrative record, you can put the, in quote, scientist on the stand and explore qualifications. You know, you've made allegations about some of these folks saying that they really weren't qualified. You could talk about the methodology and so on. And then once and for all, you could have a clear determination with a full examination and with cross-examination that would set the record in this case, hopefully refine it, and if it could be done promptly in a far more satisfactory way than what we've got now, dealing with these very contradictory positions. Well, and I believe that the issue of NEPA, the failure to disclose the scientific controversy does not need a trial, for example. Okay. So what the law requires is that people Before you say what needs one, are you saying that it would not be proper to Correct. So that whether it would be a good idea or not to have a trial, that it's not under both the acts? Correct. It would not be proper to have anything that would go beyond the record, that the court must make the decision solely on the basis of the administrative record? Yes, Your Honor. Yes. On the issue of the violation of NEPA, my clients submitted numerous statements and numerous articles supporting their assertion that the Forest Service did not know what the outcome would be of logging in the old growth habitat home to these indicator species. Nowhere in the FEIS, nor the record of decision, nor the administrative record, did the Forest Service respond to those scientific uncertainties. So the fact is, it's either there or not. The Forest Service must respond, and they didn't do it. I encourage you to look through, and I know you probably have looked through the FEIS and the rod and the record of decision. It's just not there. They needed to say, okay, we disagree with you. We disagree with you. Our studies show that, in fact, we can go in and log in flammulated owl habitat, and our studies show that, in fact, we improve the habitat. And regarding your concerns about northern goshawk, although your study says that, you know, if you go into goshawk habitat, you're only creating problems, but, in fact, our study concludes they didn't do that. That is something that must be looked at by reviewing the record plain and simple, and the response is not there. And that, again, was the outcome in the Ecology Center v. Austin. What additional facts have you learned about this case since the motion that you filed for a preliminary injunction? Other than the status of the project and where the actual units are located and where the old growth stands are, nothing. Nothing. Nothing. Why did you file, then, a motion for a preliminary injunction? Why didn't you file an action to decide the case on dismerance? We didn't. Your Honor, when we filed, we requested a temporary, a preliminary, and a permanent injunction. I understand what you did. And my question is, why did you do that rather than set it down for a trial on dismerance? That's the process that the lower court does not permit. Why? No, no. You said you asked for a permanent injunction. Yes. That was your ultimate relief. Yes. We are still proceeding to that point, and that will occur after the summary judgment briefing, which, of course, won't be decided until late this summer. Well, I think Judge Ferguson is asking, why didn't you ask for summary judgment? Because the court doesn't allow it.  to occur. The court would not allow the case to go to trial on dismerance? Correct. Okay. And just to follow up on Judge Ferguson's question, did I understand you to say that under the Administrative Procedure Act, and since you're really talking about the record, that, in fact, you can't have a trial? Is that what you're saying? Yes. There's no point. These cases are, again, it's all based upon review of the record. And so one cannot consider the Administrative Procedures Act does not allow evidence outside the administrative record to be considered. So even if you have, say, you take a civil culturist from the Bonner's Ferry Ranger District who submitted a one-page report, he could not take the stand and testify about things that weren't in this report, because, again, that was supposed to have been conducted two months or two years ago during the scoping process and during the comment process to allow the public to meaningfully participate as NEPA demands. So all of the things that would happen at the summary judgment hearing would be that the judge would look at what he looked at before, where he said it's not probable that you're going to succeed, and this time he's going to say, well, I was right, you didn't succeed. I mean, it's just looking at the same thing you looked at. I agree. You're making a final decision instead of a preliminary decision. Typically what happens, for example, there was just a recent case, the Lands Council v. Martin, in which an injunction pending appeal was sought. The Ninth Circuit reversed the lower court decision partially, concluded that the law had been violated. The district court had abused its discretion, sent it back with an order requiring that the lower court issue an injunction and opine that the law had been violated. And therefore, that case is now proceeding to summary judgment hearing, however, the lower court now has guidance from the Ninth Circuit saying, by the way, that actually was a legal violation that you apparently, you know, abused your discretion in not finding. Kennedy. All right. Thank you. How much time do I have left? None. None. Well, thank you. But we will give you a little time for rebuttal. May it please the Court. My name is Thomas Swiegel, and I am appearing today on behalf of Apelli Renata McNair, the Forest Supervisor of the Idaho Panhandle National Forests. Let's start with the question that Judge Smith had asked. Do you agree with counsel that there is no, that out of trial, all that is permitted is the introduction of the record? This is my take on what the proceedings up to this and then the answer to your question. Lands Council, when it's filed its complaint, requested a preliminary injunction and a final, a permanent injunction. So the Court properly scheduled up a preliminary injunction hearing, and the Court decided that. That normally, now to answer your question, these are record review cases, and normally the trial, the case will be decided on the administrative record. There are limited circumstances in which district courts can allow to go outside the administrative record. Lands Council could assert that. The government would likely oppose going outside the administrative record. But there are circumstances where there may be a trial that would have, have some witnesses if the Court found that the exceptional circumstances exist. It sounds like they're not going to do that. What exceptional circumstances would there be? If there's a, if there's, for example, and I haven't examined this closely because it wasn't raised, but if, if the record was found to be inadequate or if there was something misleading about the record, there are, the courts have set very limited circumstances for going outside the administrative record. If those don't exist, this case quite likely will be tried on summary judgment. So it will be tried on the papers based on the administrative record. If Lands Council doesn't try to go outside the administrative record, that's likely what will occur. And if they had not, if Lands Council had not sought a preliminary injunction, we might, we might have had brief, had this case decided on summary judgment by this time, but that's not the posture we're in right now. We're on preliminary injunction. The ---- Well, in the meantime, you're doing the damage that they see that's occurring. Just what, Justice ---- So it was, it's the normal and the proper thing to seek a preliminary injunction in this type of case. That's right, Your Honor, although Lands Council has said it is concerned about all of the acreage that's covered by the project. The Court that it has been, and the Ninth Circuit noted that only a small, only a, there's only 277 acres of old growth forest covered by this project. And there's another complicating factor is there are three timber sales involved here. Two have actually occurred, and one of those only has 14 acres of old growth. The other has none. The final timber sale was put up for bid, and nobody bought it. And so it has not proceeded, and that's the one with the vast majority of the old growth forests. And so that, that has not gone forward. So that's sort of the posture. There has been ---- But it's not gone forward, but the plan is to go forward at some point, right? Yes, and in fact, yes, for that third. Someday they do hope to put it up again for auction, although right now they've been told by the timber companies that the price of gas is too high. It's helicopter, this is a stand that's going to have to be cut by helicopter. And it is apparently the timber companies have said it's not economical to do the bid on it, and so that's why that hasn't proceeded. And what about the first two, the two that have already been auctioned off and bid on? Is the work completed on those two? No, one of the two has finished. They finished about 35 to 40 percent of that project, and the other one they finished about 25 percent. They actually do do some of the cutting in winter because it is actually better for protection of wildlife habitat. There are some species, for example, the boreal frogs, which lands council raised. They're underground during the winter, and it's protective of wildlife habitat to do the cutting during the winter. Some other animals, it's a time when they are not doing their nesting and breeding. Those two lots, you say they don't involve old growth? One has no old growth at all. The other has 14 acres of old growth. And as part of the agreement to proceed in light of the temporary emergency motion that lands council filed, the Forest Service agreed that it would not enter those 14 acres of old growth without giving two weeks of advance notice to the lands council, and they have not entered that. And that continues, right, that assurance? Yes. Lands council has attempted to portray this issue. The problem that I have, you say that this case is going to end up by deciding a motion for summary judgment? That's a likely outcome, Your Honor. And that motion for a summary judgment will be based upon the administrative record? Correct. Anything else? No. It should be based on the administrative record unless one of the exceptional circumstances. Are there disputed views in the administrative record? There are. There's an examination of disputed views, Your Honor. Yes, there is. There are. There are disputed views. The lands council, for example. It'll be yes or no. Yes, there are. There are papers that. Okay. Well, how can you grant a motion for summary judgment then when there are disputed views in the administrative record? Well, the Forest Service has a responsibility to consider disputing views, and that's one of the arguments that lands council raises. They assert that we have not considered opposing views. We have, in fact, considered those. So the Forest Service examines those, and they included some of the materials that lands council submitted, but they also included scientific papers that support their analysis on the validity of this timber project. Lands council is. I just want to briefly summarize a few points. They're attempting to portray this as an effort to extract large amounts of timber and to build roads through the forest. That's really a mischaracterization of what this project is about. I urge the court to look at Chapter 3 of the supplemental EIS, where the Forest Service gave careful analysis to the problems that have resulted in much denser, crowded, unhealthy old growth forests and mature forest stands. And the Forest Service is attempting to implement civil cultural treatments that will create the more open stand structures that existed historically in these dry site old forests. They will also benefit wildlife that need that stand structure in order to exist. There are some wildlife, such as flammulated owls, and they are a guild for other species that function like them, that need the open structure that existed historically. And there is strong scientific support in the record for what the Forest Service is doing. Another thing that lands council is saying is that this is a project to create roads. And the fact is that the Forest Service is removing 13 miles of roads. It's decommissioning them. Another thing it's doing is improving roads, and those improvements are meant to reduce sediment runoff that goes into rivers. They are meant to benefit the environment. Another thing that is important to note is that the Forest Service issued an initial EIS in 2004 for this project. After this court's decision in lands council v. Powell, the Forest Service spent another almost two years reexamining the record. It reopened, and it reopened its analysis, and it completed a new supplemental EIS in which it revised the selected alternative in light of that new analysis. And if you look through the supplemental EIS, you will see that throughout it there are places where there are two columns of text. That is additional analysis that occurred since 2004. Counsel, as you know, the lands council has systematically gone through that supplemental EIS and highlighted areas of deficiency. What is the standard by which we are to review this? Obviously their position is taken as a matter of law. They think that it's been not complied. The district court felt otherwise, at least based on the preliminary information. What standard do we review this by? Abuse of discretion? Well, it's an abuse of discretion standard for review of the district court's findings. But this is a specialized agency, so we have a special obligation of deference, right? That's right. There's discretion to the agency's findings, and whether there is evidence, substantial evidence that supports the agency's findings. And there is definitely substantial evidence in the record that supports the Forest Service. Let me just continue. One thing. Is there anything, any of the allegations that the lands council has made about deficiencies in the record with which the Forest Service agrees, that you can concede they're correct? No, there is not, Your Honor. None at all. There is not. So from your perspective, you have, you've met the Ecology Center, you've met Powell, you've met all the requirements. The scientists are qualified. The court was right. That's right, Your Honor. And the lands council has attempted to, one of its main arguments under the National Forest Management Act, is it's attempting to portray this case as much like Ecology Center for Powell, in which, in that case, the Ninth Circuit said there was only one paper that supported the Forest Service's scientific findings. This case is much different from that. There is much more ample evidence in the scientific record. I'm not going to have time to go through for all of these species, but if there are any species about which the court is concerned, I urge you to look at, in Chapter 3 and Chapter 4 of the Supplemental EIS, there is a discussion of the current conditions of habitat for each of the species, and in Chapter 4, there is a thorough discussion of the effects of the alternatives that they looked at as part of the EIS. In fact, it's important to note, lands council is attempting to, when they said there was only one scientific paper that supported them, we, on our answering brief, showed that there were at least six papers that talked about the effects of wildlife. In their reply brief, they've pulled out one or two sentences from some of those papers and say they do not support us. I urge the court to look at the totality of those papers, because those studies do, in fact, support the Forest Service's analysis, and they were factored in to the analysis that was completed in Chapter 4 of the Supplemental EIS. Counsel, the district court's order dated December 18th purported to address each of the issues raised by the lands council, and to point out in the record what it felt were the responsive elements of the Forest Service paperwork. Would you agree that the district court correctly described the best responses to the land council's allegations? I think that one of the important things that Judge Lodge did was that he said in the Forest Service analysis that the current stand structure of the old growth and mature forests in the project area is not healthy, and there is strong scientific support in the papers he cited that it is necessary to treat these areas to bring them back to the historic stand structure so that they are healthy, and they will also be better for wildlife because they are currently in an insect and root disease, and they are not in a, by not having their historic open stand structure, they don't benefit certain species that need that in order to be able to thrive. The court counsel is getting quite nervous. There's only seven minutes left. Okay. Just to wrap up, there are important studies that the Forest Service included. The Montana Partners in Flight specifically, which is a bird conservation organization, specifically supported the type of activity that the Forest Service is doing here. So I request that the court uphold the denial of the preliminary judgment. I've got to just make sure this is clear. You've handed the members of the court a copy of what I assume is some old growth showing the smaller trees you want to harvest. Is that correct? That is submitted by Mr. Hornegren. Okay. He'll explain. I'll go through that. Okay. Thank you. May it please the court, Scott Hornegren on behalf of Boundary County up in Northern Idaho for the interveners here. I think part of the confusing problem or the troublesome problem here is that it's important. Was this photographed in the administrative record? Yes. In the lower left-hand corner, it's in the supplemental excerpt of record, the federal supplemental excerpt of record at page 170. Okay. And this photo, I think, capsulizes why Boundary County is concerned about this project going forward. The court had to weigh the harms and the public interest in this case, and we think when you review a preliminary injunction decision, that it struck the right balance. It didn't abuse its discretion. There's nothing here on the plaintiff's appeal or appellant's appeal that says that that balance in the last three or four pages of the opinion was improperly struck. And we would argue that it was struck in this case. Well, they argue that the trial judge used the wrong test to determine whether or not a preliminary injunction should be issued. No, not in this case. Let me finish my question.  I'm sorry, Your Honor. He said the test is that the plaintiff must show a significant harm. When the real test is the possibility of irreparable harm. Now, there's a big difference between those two tests. That's right. Didn't he use the wrong test? No, Your Honor. With due respect, in Earth Island Institute, the case from California on the El Dorado National Forest, they used the wrong test, and that was one of the fundamental basis for appeal in that case. In this case, there is no claim that the wrong test was applied. And we would argue that the Supreme Court has said that even if you have a violation of environmental statute, which you don't have here in the Amico v. Gambell case, they rejected a Ninth Circuit holding that the district court's equitable discretion was constrained in an environmental case such that an injunction was a required remedy absent unusual circumstances. And this Court, following that Amico case and funds for Animals v. Lujan said that, quote, merely establishing a procedural violation of NEPA does not compel the issuance of a preliminary injunction. Counsel. Go ahead. I'm sorry. Counsel, and just to follow up on the point you made of Indigo, I think the language of the land's counsel did claim there was the wrong standard was applied by the judge. And I think it's cited to Earth Island, and I think Judge Fletcher, in which he cited the following, we conclude that each of the statements places a higher burden of proof on the plaintiff than is warranted. That's what they returned to trial court there. And they said, we emphasize that a preliminary injunction, in quotes, only requires plaintiffs to show probable cause, success on the merits, and the possibility of irreparable harm. Now, that's a different standard than the district judge applied in this case, isn't it? No, it's not, Your Honor. And the district court was careful to point out that in environmental cases that you consider one of the concerns is, is there irreparable harm? What was his test? His test, he explains on the record, supplemental excerpt of record, page 674. What page of his order is that? What? Page, supplemental excerpt of record, page 674. It's in his order on page 14 and 15. So I'm reading from 674 and 675. And on 675, first full paragraph, the court finds plaintiffs have failed to satisfy the showing of a combination of probable success on the merits and possibility of irreparable harm. The district court cited the proper standard and then went forward to apply the standard. And one of the concerns that the county has with this photograph that you have here is that these stands are dying. And this is a tragedy of great proportions on the east side of the mountains in the west, is that these young trees, these fir trees, these shade-trawling trees are coming up on these older trees that you see here, and fires are burning through there, and insects and disease is going through there. And that's happened in Boundary County. 80,000 acres were burned in the Sundance burn back in 1976. And the Forest Service acknowledges that we have this problem, or 1967, that we have this problem again creating itself. And what the Forest Service did in this case and what the judge did is he considered that and he examined the fact that the big trees you see in this photograph will not be cut. The smaller trees are the ones that are going to be cut. And in terms of the wildlife analysis that the Forest Service did in the EIS, they concluded that part of, for example, some of the species, in order to forage and catch the rodents and the other animals to get food, they can't fly through this stuff. And the flammulated owl is one of the birds that they are trying to improve the habitat for. This is different than Ecology Center. In Ecology Center in Montana, the forest had burned. The Forest Service's own biologist says, look, we have a problem with the blackback woodpecker. There's not enough snag habitat. And in your project in Ecology Center, what are you going to do? You're going to remove further snag habitat that was destroyed by the fire, and you don't have any basis. Here, the habitat in short supply, the habitat that's disappearing, is this old forest, open-grown ponderosa pine, the drier forest, where you have the ponderosa pine and large trees. And the Forest Service wants to restore that for the wildlife and for the safety of the people and the recreation, and Boundary County wants to see that done as well, Your Honor. And that's why we think that the judge considered this, not just based on the declarations, but based on the information in the record. And we would urge the Court, in this particular case, in the context of a preliminary injunction, plaintiffs could have filed. The Federal rules say you can file your summary judgment motion within 20 days after your complaint. Here we are six months afterwards, and now we're going to stop the project. We ---- When was it filed, the summary judgment motion? The summary judgment motion still hasn't been filed, Your Honor. It still hasn't been filed. But the counsel gave us a date. It was scheduled for it. It's scheduled and ---- What do you mean? Who scheduled it? I'll ---- Excuse me. Well, you're going to get in trouble. Okay. Anyway, it is scheduled, and I concede it is scheduled. And so, Your Honor ---- Do you agree that under the APA that a full trial of this is not going to accomplish anything, that this is ---- the summary judgment is the only proper approach to reviewing this record? With the limited exceptions that government counsel has stated, I agree. This is on the record. And I think the Supreme Court has helped the Court here in the Baltimore gas case. Admittedly, and this is the nature of public land management, there is no certainty. It's like the global warming. Things are evolving about what's causing it. There is no certainty. There's a lot more certainty than some people think about global warming. There is more certainty. And what the Forest Service found in terms of the certainty here was that in terms ---- what is certain is these stands are dying, and they're going to burn up, and there's insects in there now, and there's insect academic. And what the Supreme Court said in the Baltimore gas case is when evaluating agency decisions at the frontiers of science, the deference to the agency decisions should be at its most deferential. And we would argue, Your Honor, in this case that the district court properly weighed the equities, considered the public interest, and would ask you to affirm the preliminary injunction in this case. Thank you, counsel. May I speak, Your Honor? Yes. Thank you. Briefly, with respect to the forest's grave concern for these management indicator species, interesting that the SFEIS states with respect to the northern goshawk, in general, regeneration treatments would move stands out of suitable nesting conditions, but may still provide or even enhance foraging conditions on the periphery of the units. However, most of the currently capable acres treated by selective harvest should move into suitable habitat conditions over time. Regarding projects' impacts upon the western toad and its breeding habitats, the wetlands, the FSEIS states it may result in temporary disturbance within treatment areas. However, the changes in vegetation structure should have long-term effect. Counsel, what is the standard? I hear what you're saying. I read part of the record here on this thing. I gather there is no scientific certainty one way or the other on some of these issues about the habitat for some of the animals. What's the standard here? Does the Forest Service have an obligation to prove beyond the reasonable doubt, say, or by the preponderance of the evidence? What's the standard here, or is it just required to discuss? Well, that's a fabulous question. Again, I would turn, Your Honor, to Ecology Center v. Austin, in which Judge Fletcher wrote that, although the appellant's ecology center hadn't proved that the logging would harm the dependent species, the Forest Service hadn't proved that it wouldn't. And given the record and the studies and the arguments that Ecology Center had raised, such as the fact that old growth is not merely a tree, it is the downwoody debris, it's the duff, it's the cavities in the snags that are necessary, it's more than a tree. And given that historical conditions have been changed significantly due to fire suppression and logging, we're not dealing with the same forest. And therefore, there must be an analysis and solid science about how they're going to accomplish what they say they will. Go ahead. Let me ask you a question about the propriety of evidence in a trial below. Okay. The government mentioned exceptions. Among the exceptions is if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision. Next, another one is when supplementing the record is necessary to explain technical terms or complex subject matter. Well, as far as I'm concerned, this is pretty complex subject matter. And I think the problem that we've been having, and as I said to you, we could spend a lot more time and understand a lot more than we do now, and that's not unusual. But it may well be that if there were witnesses who could deal with the complex subject matter and provide some testimony as to what it is, what it means, whether these reports really are exhaustive, why they're not, that would seem to come under the exception. Well, I guess, Your Honor, I would submit to you that, one, Judge Fletcher didn't feel the need to do that. There have been, there's a long history of litigation on NEPA and NIFMA in which judges such as yourself have been able to review the record to conclude. Admittedly, it is complicated. However, I would again turn back to NEPA, and I'm questioning, is the burden going to shift to my clients to prove something when the Administrative Procedures Act requires that the Forest Service have this in the record? Say we have a trial. My clients have to incur the cost of hiring experts to come in and flesh out what these studies that they wrote were about. The Forest Service has their experts. My clients are nonprofit organizations. It completely shifts the burden contemplated under the APA and NEPA. And I will leave on, I feel like I haven't adequately articulated to you why NEPA is so important and why, under the NEPA analysis alone, this Court should find that the law was violated. Again ---- But doesn't NEPA require that there be full disclosure, full discussion? Yes. And then based upon that, it's not determinative of the result. It's a discussion of what's there. Right. The Forest Service contends, and the trial judge believed, that in fact it had addressed these issues. And I know that the Lands Council has pointed out a number of areas, fairly focused areas, where you find it deficient. But unfortunately, in this matter, we're not in a game of perfection here. There's imperfections all around. To some degree, there's guessing involved because nobody knows. So I want to go back to your point about Ecology Center. Did I understand you to imply or say that Judge Fletcher's writings imply that if the plaintiff contends one thing and the defendant contends another, that in effect, if there is an uncertainty, that the defense wins? Is that your contention? No, it's not that simple. Let me read to you from the opinion, please. Okay. What page are you looking at? I'm looking at page 1064. It's under the section NIFMA. It's the third full paragraph under NIFMA. And it states, An agency's choice of methodology is entitled to deference. And it cites Salmon River Concerned Citizens v. Robertson, 32 F3D 1346. However, there are circumstances under which an agency's choice of methodology and any decision predicated on that mythology are arbitrary and capricious. For example, we have held that in order to comply with NIFMA, the Forest Service must demonstrate the reliability of its scientific methodology, Lands Council 379 F3D 752. Holding NIFMA requires that the hypothesis and prediction of the model be verified with observation. Here, as in Lands Council, the Forest Service's conclusion that treating old-growth forest is beneficial to dependent species is predicated on an unverified hypothesis. While the Service's predictions may be correct, the Service has not yet taken the time to test its theory with any, quote, on-the-ground analysis, despite the fact that it has already treated old-growth forest elsewhere and therefore has had an opportunity to do so. In this particular, and I appreciate your pointing that out, but in this particular case, the Forest Service claims that it has done on-the-ground testing. I realize you're talking about a small portion of a larger area. But, you know, it was on-the-ground testing, as they have alleged, and they claim that this is basically the best evidence that's available to respond to the point that you've made. That's insufficient from your perspective, I gather. To go into the critical, last remaining old-growth habitat, absolutely. Okay, but again, if I understand correctly, nobody's contending that the old-growth is going to be cut down. We're talking about, or am I wrong? I thought we were just talking about the smaller trees between the big trees. But Lands Council's position is, when you go in and manipulate the old-growth stands, you adversely impact the stands and the habitat, because again, these stands are not just trees. They are the integrity of the old-growth stand, which is the canopy cover, which they will be reducing, which is the duff on the ground, which is the snags that are habitat for these management indicator species, birds. So what the Lands Council is saying, and by the way, I encourage you again to look at the lower court's order, the lower court cites two scientific studies, none of which even discuss wildlife. The two studies cited by the court are impacts of logging on old-growth, not on the wildlife. The paragraph you were quoting from says that it is arbitrary and capricious for the Forest Service to irreversibly treat more and more old-growth forest without first determining that such treatment is safe and effective for dependent species. I gather your complaint is that they don't have adequate studies, on-the-ground studies, showing the effect on the species? Yes. Now, one of them had to do with the granulated or phenolated or whatever it was. Flammulated owl. Some kind of owl. Flammulated owl. Flammulated owl. And your complaint was that they only went into one small area and only found one hoot? Well, but more importantly, look at what the study concludes. The study concludes that the civicultural treatment did not improve the wildlife habitat. It's almost like you've got an irresistible force meeting the immovable object here because I don't see how you're going to get the scientists, in quotes, to agree on this. You've got some who are of the view that removing this smaller growth will benefit the wildlife, will benefit the older trees, and will prevent fire. You feel to the contrary. You have your people. But the reality is that these things, they're not going to cross. These lines are not going to cross. And so, certainly under NEPA, it's really more a requirement that there be a discussion so everybody knows that there is a dispute. Under the Forest Service Act, it's a little different, and I gather that's part of your contention that the Forest Service Act has been not. The Forest Service, again, quoting from Ecology Center v. Austin, page 1062, the decision states, unlike NEPA, NEPA imposes no substantive requirements. Instead, it is designed to, quote, to publicly consider the environmental impacts of their actions before going forward. Idaho Sporting Congress, 305F3D at 963. Quote, Specifically, NEPA requires the preparation of a detailed environmental impact statement, and EIS must, quote, On that point, my clients submitted ample evidence that the species would be harmed by the logging. The Forest Service did not respond and say, okay, here would be another way we could do it that, in fact, wouldn't harm these species. They didn't consider it. They didn't discuss it. That violates NEPA. Thank you, counsel. Thank you, Your Honors. Thank you all very much for trying to enlighten us on this issue, but we'll do our best. Thank you. Thank you. The case just argued will be submitted. The Court will adjourn for the day. All rise.
judges: Ferguson, Reinhardt, M. Smith